| | |
|---|---|
| JUAN PAGAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 3:15-CV-1121-GCS |
| | ) |
| VIPIN SHAH, | ) |
| | ) |
| | ) |
| Defendant. | ) |

# MEMORANDUM AND ORDER

SISON, Magistrate Judge:

## I. INTRODUCTION AND BACKGROUND

Pending before the Court is Defendant Vipin Shah's motion for summary judgment (Docs. 49, 50 & 53).[1] Plaintiff Juan Pagan opposes the motion (Doc. 51).[2] Based on the following, the Court grants the motion for summary judgment.

Pagan, a former inmate of the Illinois Department of Corrections ("IDOC") who was incarcerated in Robinson Correctional Center ("Robinson"), filed a *pro se* lawsuit pursuant to 42 U.S.C. § 1983 for deprivations of his constitutional rights (Doc. 1). The Court dismissed without prejudice Pagan's original Complaint (Doc. 7). Thereafter, he filed an Amended Complaint (Doc. 8). Specifically, Pagan's Amended Complaint

---

[1] On January 10, 2019, this matter was referred to the undersigned for final disposition upon consent of the parties (Doc. 66).

[2] The Court assigned Attorney Matthew Kelly to represent Pagan on September 6, 2017 (Doc. 38).

contains allegations regarding the medical care he received at Robinson from Dr. Shah for injuries sustained to his left foot while playing basketball in the yard.

Following a threshold review of the amended complaint pursuant to 28 U.S.C. § 1915A, Pagan was permitted to proceed on the following claim:

> **Count 1** – Shah was deliberately indifferent to Pagan's serious medical needs in violation of the Eighth Amendment.

(Doc. 12, p. 3). In the reviewing the Amended Complaint, the Court summarized the allegations as follows:

> On August 28, 2014, Plaintiff played basketball on the yard at Robinson. (Doc. 8, p. 5). He suffered a severe sprain in his left foot. (Doc. 8, p. 5). While he received first aid, he had to wait three days to see a doctor with only an elastic bandage and OTC pain relievers. (Doc. 8, p. 5). Plaintiff saw Defendant Shah, who taught Plaintiff how to avoid putting pressure on his foot. (Doc. 8, p. 5). Shah provided no other treatment at that time. (Doc. 8, p. 5). Shah reviewed the x-ray with Plaintiff on September 12, 2014 and told Plaintiff that his foot was not fractured, only sprained. (Doc. 8, p. 5). Plaintiff alleges that a subsequent x-ray from March 6, 2015 shows a fracture of the second metatarsal. (Doc. 8, p. 5).
>
> Although Shah ordered another x-ray on October 24, 2014, he represented that the x-ray likewise showed no fracture or dislocation. (Doc. 8, p. 5). It also appears that someone issued Plaintiff walking crutches and special boots. (Doc. 8, p. 5). Plaintiff was allowed to keep his job as a porter. (Doc. 8, p. 5). Plaintiff requested an MRI, but was denied. (Doc. 8, p. 6). He also requested to see an orthopedic surgeon for an evaluation, but that request was also denied. (Doc. 8, p. 6). Plaintiff cannot walk or stand for long periods of time without pain. (Doc. 8, p. 6). Plaintiff's foot is also unstable, and he alleges that there is a visible crack in his middle toe. (Doc. 8, p. 6). Health care has not addressed Plaintiff's requests for follow up care.

(Doc. 8, p. 6).

Shah moved for summary judgment arguing that he was not deliberately indifferent to Pagan's medical needs regarding his left foot. Pagan counters that Shah delayed an adequate examination of his left foot. He further alleges that Shah should

have sent him to an orthopedic specialist and for an MRI. Pagan further alleges that Shah failed to place him on a work medical restriction.

## II. FACTS

The following facts are taken from the record and presented in the light most favorable to Pagan, the non-moving party, and all reasonable inferences are drawn in his favor. *See Ricci v. DeStefano*, 557 U.S. 557, 586 (2009).

The events and facts at issue in this lawsuit as it relates to Dr. Shah occurred at Robinson from August 2014 to May 2016. On August 28, 2014, Pagan rolled his ankle while playing basketball when another inmate stepped on his foot. Pagan was treated in the healthcare unit within 30 to 45 minutes of his injury. At the healthcare unit, a nurse treated Pagan. During this visit, Pagan reported the pain as throbbing. He further reported that the pain was an 8 out 10 and that his mother had hit him in the same area with a 2x4 as a child. The nurse placed an elastic Ace bandage on the foot to stabilize the swelling, provided cold pack and Tylenol 325 mg for pain, provided Pagan crutches and told Pagan to elevate the foot and to follow-up for medical treatment.

Pagan returned to the health care unit on August 31, 2014, and again was seen by a nurse. He reported stabbing and pulling pain in his left foot with a pain level of 8 to 9 out of 10. The foot was bruised, swollen, warm to the touch and there was decreased range of motion. The Ace wrap, cold packs, crutches and elevation were continued for management of the swelling. The pain medication was also continued and Pagan was referred to the medical doctor.

The physician's note from August 31, 2014 indicates a left ankle sprain and a suspected foot contusion. The physician continued Pagan on the crutches and the Ace wrap, prescribed Motrin 600 mg for pain, instructed Pagan to keep the foot elevated and to follow-up in one week.

Thereafter, on September 11, 2014, Pagan went in for a follow-up appointment. He advised the doctor that his ankle pain was much better. However, Pagan continued to experience pain on the dorsum of the distal part of the left foot. He further complained about using the crutches and that his foot was still tender and sore. The records note the swelling had improved but there was still discoloration on the foot. Pagan's treatment plan included the continued use of the Ace wrap, leg elevation, stretching and exercise, Motrin 600 mg for pain, a follow-up in two weeks and the ordering of x-rays.

X-rays of Pagan's left foot and left ankle were taken on September 12, 2014. Pagan was seen for a follow-up appointment on September 19, 2014. During this appointment, Pagan stated he did not need the crutches and asked for stronger Ibuprofen. The notes state that the September 12, 2014 x-rays were negative for a fracture and that they were to be sent for outside radiology review. Pagan's treatment plan was continued with an increase of Ibuprofen 800 mg for at least 10 days.

On September 24, 2014, Dr. Yousef from One Radiology in Normal, Illinois, reviewed the September 12, 2014 x-rays. Dr. Yousef found a minor degree of degenerative change and a fracture of the proximal end of the 2nd metatarsal, which

was best seen on the lateral and oblique views. Dr. Yousef also noted that the fracture was non-displaced. Dr. Yousef recommended a follow-up examination of the left foot.

Pagan was seen again for a follow-up appointment for a suspected foot sprain on September 25, 2014. The record noted no swelling but did note mild tenderness in the foot. Pagan was continued on the treatment plan for Ibuprofen, Ace wrap, limitations on exercise and follow-up within two weeks.

Shan's medical note on October 2, 2014 recognizes Dr. Yousef's conclusion of a non-displaced fracture at the proximal end of the 2nd metatarsal. At this time, Pagan was prescribed a rehabilitation/walking boot.

Pagan saw Shah on October 11, 2014 for a follow-up appointment. The records reveal some swelling and that Pagan was using the boot. Pagan was continued on the use of the boot, prescribed Ibuprofen 400 mg for the next 30 days as needed for pain and a follow-up x-ray was ordered. Shah also told Pagan to come back in a month.

Pagan had another x-ray performed on October 24, 2014. This x-ray was reviewed by Dr. Austin of One Radiology on October 28, 2014. Dr. Austin compared the October 24, 2014 x-rays with the September 12, 2014 x-rays and found the following: "[t]he joint spaces and alignment are maintained. There is no acute fracture or dislocation. No aggressive appearing osseous destruction or erosion is seen. There is stable linear density dorsal to the distal tuft of the great toe, compatible with foreign body."

Next, Pagan saw Shan on December 6, 2014 for a follow-up visit. Shah requested another x-ray to rule out fracture or another injury and continued Pagan's

treatment plan, including Ibuprofen and exercise to manage pain and swelling. Pagan had the x-rays taken on December 8, 2014.

On December 10, 2014, Dr. Yousef examined the December 8, 2014 x-rays. Dr. Yousef found the following: "[t]here is a small metallic density along the dorsal aspect of the distal tuft of the great toe again seen without changes. This may represent a foreign body. There is mild osteoarthritis at multiple levels, but not acute bony fracture or dislocation is noted and there is overall no significant changes." At this time, Pagan was 27 years old.

Then Pagan saw a nurse on February 21, 2015 complaining of bone pain while walking. Pagan also requested an MRI. Pagan indicated pain on the top of his foot when walking. The nurse prescribed Ibuprofen for pain management, instructed Pagan as to the importance of avoiding certain sports and activities and referred Pagan to the physician.

On February 23, 2015, Pagan saw a different doctor for follow-up for his left foot pain. The record notes that Pagan stated: "I feel good today." The records also indicate that the doctor reviewed Pagan's physical therapy, Pagan's use of the rehabilitation boots and the difference in the pain between walking and resting. The record further notes that Pagan also had a right foot injury. The doctor prescribed Ibuprofen 200 to take as needed for ten days, reviewed the x-rays, discussed physical therapy and informed Pagan to avoid jumping and to follow-up as necessary.

Thereafter, Pagan returned to the healthcare unit on April 10, 2015, May 6, 2015 and May 15, 2015 for complaints of left foot pain. During these visits, Pagan

rated his pain as ranging from 3 to 8 out of 10. Each time, nurses examined Pagan and either prescribed Ibuprofen or Acetaminophen for pain management and instructed Pagan to return as needed. After the May 15, 2015 appointment, Pagan was referred to the doctor.

Next, Pagan saw the physician on May 19, 2015. Pagan described the pain in his ankle when he tries to stretch. He further noted that the pain moved up his leg to his knee and thigh. Pagan also stated that his lateral foot was discolored, and he had been walking on the lateral aspect of his foot due to pain. The physician noted no discoloration and that the ankle was intact.

Thereafter, Pagan saw a nurse for foot pain on September 26, 2015 for complaints of foot pain while walking too much. Pagan then saw a nurse for left ankle/foot pain on November 25, 2015, on January 19, 2016 and on May 10, 2016. Eventually, Pagan saw Shah on May 13, 2016 for left foot pain and complained of the injury he sustained in August 2014. Shah examined Pagan's foot and noted that his vitals, movements and sensation were all normal. Shah prescribed Ibuprofen 400 (30 per month for 6 months) and told Pagan to continue to elevate the foot and to exercise to control swelling and strengthen the foot.

Pagan did not have any additional treatments related to his left foot while at Robinson following the May 16, 2016 appointment.

### III.   ANALYSIS

Summary judgment is proper only if the moving party can demonstrate there is no genuine issue as to any material fact and the movant is entitled to judgment as

rated his pain as ranging from 3 to 8 out of 10. Each time, nurses examined Pagan and either prescribed Ibuprofen or Acetaminophen for pain management and instructed Pagan to return as needed. After the May 15, 2015 appointment, Pagan was referred to the doctor.

Next, Pagan saw the physician on May 19, 2015. Pagan described the pain in his ankle when he tries to stretch. He further noted that the pain moved up his leg to his knee and thigh. Pagan also stated that his lateral foot was discolored, and he had been walking on the lateral aspect of his foot due to pain. The physician noted no discoloration and that the ankle was intact.

Thereafter, Pagan saw a nurse for foot pain on September 26, 2015 for complaints of foot pain while walking too much. Pagan then saw a nurse for left ankle/foot pain on November 25, 2015, on January 19, 2016 and on May 10, 2016. Eventually, Pagan saw Shah on May 13, 2016 for left foot pain and complained of the injury he sustained in August 2014. Shah examined Pagan's foot and noted that his vitals, movements and sensation were all normal. Shah prescribed Ibuprofen 400 (30 per month for 6 months) and told Pagan to continue to elevate the foot and to exercise to control swelling and strengthen the foot.

Pagan did not have any additional treatments related to his left foot while at Robinson following the May 16, 2016 appointment.

### III.   ANALYSIS

Summary judgment is proper only if the moving party can demonstrate there is no genuine issue as to any material fact and the movant is entitled to judgment as

a matter of law. *See* FED. R. CIV. PROC. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Ruffin-Thompkins v. Experian Information Solutions, Inc.*, 422 F.3d 603, 607 (7th Cir. 2005). Any doubt as to the existence of a genuine issue of fact must be resolved against the moving party. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970); *Lawrence v. Kenosha Cnty.*, 391 F.3d 837, 841 (7th Cir. 2004).

A moving party is entitled to judgment as a matter of law where the non-moving party "has failed to make a sufficient showing on an essential element of h[is] case with respect to which []he has the burden of proof." *Celotex*, 477 U.S. at 323. A party asserting that a fact is genuinely disputed must support that assertion by citing to particular materials in the record or by showing that the materials in the record do not establish the absence of a genuine dispute. *See* FED. R. CIV. PROC. 56. If the non-moving party does not show evidence exists that would reasonably allow a fact-finder to decide in its favor on a material issue, the court must enter summary judgment against the non-moving party. *See Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

The Seventh Circuit has stated summary judgment is "the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007)(quoting *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005)).

The Supreme Court has recognized that deliberate indifference to the serious medical needs of prisoners may constitute cruel and unusual punishment under the

Eighth Amendment. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To prevail on a claim for deliberate indifference to a serious medical need, there are "two high hurdles, which every inmate-plaintiff must clear." *Dunigan ex rel. Nyman v. Winnebago Cnty.*, 165 F.3d 587, 590 (7th Cir. 1999). First, the plaintiff must demonstrate he suffered from an objectively serious medical condition. *Id.* at 591-592. Second, the plaintiff must establish the individual prison officials were deliberately indifferent to that condition. *Id.*

To show prison officials acted with deliberate indifference, a plaintiff must put forth evidence that prison officials not only knew that the prisoner's medical condition posed a serious health risk, but they consciously disregarded that risk. *See Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012). "This subjective standard requires more than negligence and it approaches intentional wrongdoing." *Id. Accord Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010)(stating that "[d]eliberate indifference is intentional or reckless conduct, not mere negligence."); *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010)(stating that "negligence, even gross negligence does not violate the Constitution.").

For a medical professional to be held liable under the deliberate indifference standard, he or she must respond in a way that is "so plainly inappropriate" or make a decision that is "such a substantial departure from accepted professional judgment, practice, or standards," that it gives rise to the inference that they intentionally or recklessly disregarded the prisoner's needs. *Holloway*, 700 F.3d at 1073; *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008)(quoting *Sherrod v. Lingle*, 223 F.3d 605,

611 (7th Cir. 2000)). In other words, a prison medical professional is "entitled to deference in treatment decisions unless no minimally competent professional would have so responded under those circumstances." *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011)(citation omitted).

"But deference does *not* mean that a defendant automatically escapes liability any time he invokes professional judgment as the basis for a treatment decision. When the plaintiff provides evidence from which a reasonable jury could conclude that the defendant didn't *honestly* believe his proffered medical explanation, summary judgment is unwarranted." *Zaya v. Sood*, 836 F.3d 800, 805 (7th Cir. 2016). The Eighth Amendment does not require that prisoners receive "unqualified access to health care[.]" Rather, they are entitled only to "adequate medical care." *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006).

Construing the evidence in the light most favorable to Pagan, the Court finds that he has not established that Shah was deliberately indifferent to his medical needs regarding his left foot. The record reveals that Shah from September 2014 to May 2016 did provide appropriate medical treatment to Pagan. The medical treatment simply was not the treatment Pagan wanted or demanded. From August 2014 to 2016, Pagan received the following treatment:

- Pagan's foot was Ace wrapped;
- Pagan was provided crutches;
- Pagan was informed to keep his foot elevated;
- Pagan was prescribed with multiple rounds of pain medication;

- Pagan had multiple x-rays taken that were sent to off-site radiologists for review; and

- Pagan was prescribed a rehabilitation boot when he was diagnosed with a minor fracture.

Pagan was further instructed to continue exercising and to apply physical therapy techniques.

Clearly the record does not contain evidence that Shah's treatment for his foot was so inappropriate or that Shah's treatment was a substantial departure from accepted professional judgment, practice or standards. Even construing the facts in the light most favorable to Pagan, the medical records at the time do not support Pagan's subjective complaints. The record likewise does not support that Pagan should have been sent to an orthopedic specialist. Nor does it support that Pagan should have had an MRI performed or been placed on medical restriction. Simply put, there is no evidence that Shah was deliberately indifferent to Pagan's medical needs.

## IV. CONCLUSION

Accordingly, the Court **GRANTS** the motion for summary judgment (Doc. 49). The Court **DIRECTS** the Clerk of the Court to enter judgment in favor of Vipin Shah and against Juan Pagan. This case is **DISMISSED with prejudice**.

**IT IS SO ORDERED**.

DATED: September 30, 2019.

Digitally signed by Magistrate Judge Gilbert C. Sison
Date: 2019.09.30 14:14:32 -05'00'

GILBERT C. SISON
United States Magistrate Judge